UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CYNTHIA COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-0556-JRS-MPB |
| | ) | |
| JUSTUS AT WOODLAND TERRACE LLC | ) | |
| D/B/A WOODLAND TERRACE OF | ) | |
| CARMEL, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Motion for Summary Judgment**

Cynthia Coleman, an African American, sued Justus at Woodland Terrace LLC d/b/a Woodland Terrace of Carmel, alleging that it fired her because of her race in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a) *et seq.*, and 42 U.S.C. § 1981. Woodland Terrace moved for summary judgment. (ECF No. 66.) Because no reasonable jury could find that Coleman was discharged because of her race, summary judgment should be **granted**.

**I.  Background**

Cynthia Coleman began working as a Charge Nurse for Woodland Terrace in February 2017. (Coleman Dep. 9, Ex. D, ECF No. 67-3.) Her major responsibilities included coordination and supervision of total nursing activities in her work area and her duties included making regular rounds of her assigned work area to ascertain the conditions of all residents, supervision of the resident care, and overseeing medicine

aides and resident assistants (Certified Nursing Assistant ("CNA")). (Coleman Dep., Ex. D. ECF No. 67-3.) The resident assistants reported to Coleman. (*Id.*)

The Woodland Terrace Company Associate Handbook identified company policies, including an associate's duty to conduct herself in a professional manner that is in the residents' best interest. (Coleman Dep. Ex. C, ECF No. 67-3.) The handbook identified reasons for disciplinary action, including unsatisfactory job performance and unauthorized leaving of work or work areas prior to the end of a scheduled shift. (*Id.*, ECF No. 67-3 at 86.) In February and March 2017, Coleman signed for and acknowledged receipt of the Charge Nurse job description and the company associate handbook. (Coleman Dep., Ex D, ECF No. 67-3.) Coleman agreed that the residents on the Memory Care Unit, who suffer from dementia and other memory issues, needed assistance caring for themselves and that their safety required their regular observation. (Coleman Dep. 13, ECF No. 67-3.) She also agreed that the safety of the Memory Care Unit residents was of primary concern to all nurses and staff at Woodland Terrace. (*Id.*)

On July 18 to July 19, 2017, Coleman was assigned to work the night shift (7:00 p.m. to 7:00 a.m.) in the Assisted Living area on the second floor at Woodland Terrace. (Coleman Dep. 12, 18, ECF No. 63-3.) Woodland Terrace has security cameras; the cameras show some of Coleman's actions and those of other staff during that shift. (Coleman Dep. ECF No. 67-3.)[1]

---

[1] At her deposition, Coleman identified herself in the still photographs taken from the security camera video footage. (Coleman Dep. 32–42, ECF No. 67-3.)

Security camera footage showed that the overnight concierge entered the Memory Care Unit at 1:49 a.m., walked by the nurse's station, and encountered a female resident walking around by herself unattended. (Stites Dep. 133–34, ECF No. 67-1.) The concierge looked around the nurse's station, the dining room, the model unity, and the hallway and could not find a nursing staff member (*Id.* at 134–35.) The concierge walked by the model unit three times but could not locate a staff member. (*Id.* at 136.) Having been unable to locate a nursing staff member, the concierge went up to the second floor to get Coleman, the other nurse on site at the time, and found her in the Life Enrichment Center (essentially a break room with microwave, refrigerator, sofa, T.V., etc.). (Stites Dep. 136–37, ECF No. 67-1.) The concierge later reported to Executive Director Cole Stites that the other CNA staff were also in the Life Enrichment Center cutting the hair of Hawa Mengoua, a nursing staff member on duty. (Stites Dep. 137, ECF No. 67-1.) Coleman accompanied the concierge to the Memory Care Unit to assist the resident. (Stites Dep. 137–38, ECF No. 67-1.) After assisting the resident, Coleman left the Memory Care Unit unattended and with the unit keys. (Stites Dep. 138, ECF No. 67-1.) At one point that evening, Coleman had retrieved the keys from Ashley Martin, who was assigned to the Memory Care Unit that night. (Stites Dep. 132–33, ECF No. 67-1; Coleman Dep. 39, ECF No. 67-3.) Coleman had located Martin in the model unit in the Memory Care Unit watching T.V. (Coleman Dep. 39, ECF No. 67-3.) According to Executive Director Stites, this transfer of keys signaled that Martin was not working and was "off duty." (Stites Dep. 132–34, ECF No. 67-1.)

At 3:01 a.m., Coleman entered the In-Motion Studio where she performed stretching. (Coleman Dep. 34–35, ECF No. 67-3.) At 4:23 a.m., Coleman, accompanied by CNA Flay Johnson, exited the studio. (Coleman Dep. 35, ECF No. 67-3.) Coleman was supervising Johnson at that time. (*Id.*) Coleman admitted that the In-Motion Studio was not her duty station. (*Id.*) At 4:25 a.m., Johnson and Coleman entered the Life Enrichment Center, which was a break room equipped with a microwave, refrigerator, table, T.V., and sofa. (Coleman Dep. 35, ECF No. 67-3.) Coleman exited the Life Enrichment Center at 4:53 a.m. (Coleman Dep. 36, ECF No. 67-3.)

Coleman was scheduled to work the night shift again on July 19 to 20, 2017. When she reported to work, she, along with all the nursing staff from the night shift the night before, were called into a meeting with Executive Director Stites and Health Services Director Diane Kohan. (Coleman Dep. 20, ECF No. 67-3.) Sites told the staff that he wanted to know about what had happened on the Memory Care Unit the night before, and he said that he knew it had been left unattended. (Coleman Dep. 20–22, ECF No. 67-3; Def.'s Answer to Pl.'s Interrog. No. 6, ECF No. 67-4.) The staff said that the Memory Care Unit had not been left unattended and that someone had been on the unit. (Coleman Dep. 22, ECF No. 67-3.) All five employees were fired. (Def.'s Answer to Pl.'s Interrog. No. 6, ECF No. 67-4.) No one told Coleman that she was being fired because of her race. (Coleman Dep. 24–25, ECF No. 67-3.)

Woodland Terrace explains that it terminated Coleman's employment for abandonment of residents and her job duties while she was in the Life Enrichment Center and working out for long periods of time. (Stites Dep. 71–74, 79, ECF No. 67-1.) When

Stites and Kohan were reviewing the videos of the night shift and deciding what action to take, the issue of race was never discussed. (Stites Dep. 152, ECF No. 67-1.) In deciding to discharge the nursing staff, Stites and Kohan considered the nurses' job duties and abandonment of their assigned areas. (Stites Dep. 152–53, ECF No. 67-1.)

II.   **Summary Judgment Standard**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, a court views the facts and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255.

III.   **Discussion**

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). In deciding whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge courts consider the evidence "as a whole." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains a useful tool for presenting and assessing the evidence in discrimination cases. *Johnson v.*

5

*Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The parties have used this framework, and the Court uses it as well. *See id.*

Under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) her employer took an adverse employment action against her; and (4) a similarly situated employee outside the protected class was treated more favorably. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019); *Johnson*, 892 F.3d at 894–95. If the plaintiff makes this showing, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). The same standard is applied to discrimination claims under § 1981. *Fields*, 928 F.3d at 625.

Coleman cannot show that she was meeting Woodland Terrace's legitimate expectations or that a similarly situated employee outside the protected class was treated more favorably than she. Therefore, Woodland Terrace is entitled to summary judgment on her race discrimination claims.

Coming to work and actually working, like following an employer's policies are basic employment requirements and legitimate expectations of the employer. *See, e.g., Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001) (stating that attendance and adherence to company policies are legitimate expectations); *Evans v.*

*Patrick Alum., Inc.*, 4:16-cv-00160-TWP-DML, 2018 WL 2445544, at *6 (S.D. Ind. May 30, 2018) ("Where an employee is responsible for knowing policy and fails to comply with it, the employee cannot be said to be meeting his or her employer's legitimate expectations."). As a corollary, an employee who abandons her job cannot show that she was meeting her employer's legitimate expectations. *See Stodola v. Finley & Co.*, No. 2:05–CV–464–PRC, 2008 WL 3992237, at *14 (N.D. Ind. Aug. 21, 2008).

The evidence establishes that Coleman left her assigned work area and Charge Nurse duties for extended periods of time before the end of her scheduled shift. In the early morning, the concierge found her in the Life Enrichment Center along with the other nursing staff cutting Mengoua's hair. At some point, Coleman had retrieved the Memory Care Unit keys from Martin, who was assigned to that unit, which meant that Martin was not using them. And Coleman had left the Memory Care Unit with the keys, leaving the unit unattended for an extended time period. Yet Coleman did not return to her assigned work area, but spent extended periods of time in the Life Enrichment Center and In-Motion Studio performing personal activities that did nothing to serve the residents' interests. In both places, Coleman was accompanied by Johnson, whom Coleman was supposed to be supervising. And Coleman admitted that the In-Motion Studio was not her duty station. Thus, the evidence establishes that Coleman abandoned her work area and job duties and allowed her supervisees to do so as well, all in violation of Woodland Terrace's policies. As a result, no reasonable jury could find that she was meeting Woodland Terrace's legitimate expectations.

Even if Coleman could raise an inference that she was meeting Woodland Terrace's legitimate expectations, she has failed to identify a similarly situated employee. Coleman names three employees who she maintains engaged in similar conduct but were not discharged: (1) the concierge, (2) the nurse who gave a resident the wrong medication causing the resident to have a reaction, and (3) the nurse who slept during her shift. Coleman also argues that video from the Memory Care Unit the night after she was fired shows that no one was staffing the nursing station, yet no employees were terminated. "Similarly situated means 'directly comparable' in all material respects." *Johnson*, 892 F.3d at 895 (quoting *Reed v. Freedom Mortg.*, 869 F.3d 542, 549 (7th Cir. 2017)). In the usual case, a plaintiff must show that the comparators: (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2013)).

Coleman submits that the concierge is a permissible comparator because he violated the same general workplace rules by not staying in his designated work area or ensuring that the Memory Care Unit was staffed. But the concierge's job duties were not the same or even closely similar to Coleman's duties as the Charge Nurse. The concierge's principal duty was not resident care, as it was for Coleman. Further, Coleman was discharged not just for violating a "general workplace rule," she was fired for abandoning her assigned area and duties and leaving the Memory Care Unit unattended. The concierge's leaving the front desk unattended for a brief time to

8

track down a staff member to assist a resident on the Memory Care Unit is nothing comparable to the seriousness of Colemans's misconduct in abandoning the residents and her assigned work area and duties in favor of working out and taking a lunch break for almost two hours. To make matters worse, Coleman was the supervisor in charge, and she allowed the CNAs and other staff under her supervision to also abandon the residents and their job duties. There are material differences between the concierge's alleged misconduct and Coleman's job abandonment.

Coleman argues that the nurse who gave a resident the wrong medication is a permissible comparator because that nurse caused actual harm. There are material differences in the nurse's mistake and Coleman's misconduct. Most importantly, there is no suggestion that the nurse intentionally gave the resident the wrong medication, whereas Coleman knowingly disappeared from her assigned area and duties to engage in personal activities. Like the nurse that gave the wrong medication, there is no evidence that the nurse who fell asleep on her shift did so intentionally. Nor is there evidence that she slept for an extended time period. Without such evidence, her conduct is not sufficiently comparable to Coleman's abandonment of her duties. As for the video of the nurse's station on the Memory Care Unit the night of Coleman's termination, the video shows that the nurse's station is not staffed at all times (Stites Dep. 175, ECF No. 55-1), but it does not show that the staff on duty left the Memory Care Unit unattended and abandoned their duties for extended periods of time.

None of the alleged comparators engaged in conduct of comparable seriousness as Coleman's misconduct in abandoning her job; thus, the different treatment does not

9

raise a reasonable inference of race discrimination. Even if Coleman could raise a triable issue as to whether similarly situated employees were treated more favorably, as noted, she has insufficient evidence to show that she was meeting Woodland Terrace's legitimate expectations. Therefore, Woodland Terrace is entitled to summary judgment on her race discrimination claims.

## Conclusion

Defendant's motion for summary judgment (ECF No. 66) is **granted**.

**SO ORDERED.**

Date: 12/31/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Tiffany Ruth Guthrie
STEWART & STEWART
Tiffany@getstewart.com

Robert M. Kelso
KIGHTLINGER & GRAY, LLP (Indianapolis)
rkelso@k-glaw.com

Darron S. Stewart
STEWART & STEWART
darron@getstewart.com

Megan Ann Van Pelt
KIGHTLINGER & GRAY LLP
mvanpelt@k-glaw.com